# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| SHAMIKE STILES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 3:24-cv-01109** |
| | ) | **Judge Aleta A. Trauger** |
| INGRAM INDUSTRIES, INC., d/b/a | ) | |
| INGRAM BARGE COMPANY, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

Before the court is the Motion for Summary Judgment (Doc. No. 45) filed by defendant Ingram Industries, Inc. d/b/a Ingram Barge Company, LLC ("Ingram"), seeking judgment in its favor on all claims asserted against it by plaintiff Shamike Stiles. Ingram's motion is accompanied by a Memorandum of Law (Doc. No. 46), Statement of Undisputed Material Facts ("SUMF"), and the evidentiary material cited in the SUMF (Doc. Nos. 48-1 through 48-3).

Stiles' counsel's Motion to Withdraw as Counsel (Doc. No. 41) was granted by Order entered January 30, 2026 (Doc. No. 42). In the same Order, the court gave the plaintiff thirty days within which to have new counsel enter an appearance and notified her that, if no timely notice of appearance was filed, the court would presume that she would proceed *pro se* going forward. No attorney for Stiles has entered an appearance.

Ingram's Motion for Summary Judgment was filed several months later, on April 14, 2026. The court entered an Order on April 15, 2026, reminding the plaintiff, now proceeding *pro se*, that she must file a response to the defendant's motion no later than May 5, 2026. (Doc. No. 51.) That

deadline has passed, and the plaintiff has neither filed a response nor requested an extension of the deadline.

As set forth herein, the court finds that Ingram's motion is adequately supported and that Ingram is entitled to judgment as a matter of law.

## I.     STANDARD OF REVIEW – RULE 56

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* The movant must show that the material facts are not "genuinely disputed" by citing to evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, [and] other materials." Fed. R. Civ. P. 56(c). "A genuine issue of material fact exists when there is sufficient evidence for a trier of fact to find for the non-moving party." *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). The court must view the facts and draw reasonable inferences in the light most favorable to the party opposing the motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

"Even when faced with an unopposed motion for summary judgment, the district court cannot grant a motion for summary judgment without first considering supporting evidence and determining whether the movant has met its burden." *Byrne v. CSX Transp., Inc.*, 541 F. App'x 672, 675 (6th Cir. 2013); *see also Delphi Auto. Sys., LLC v. United Plastics, Inc.*, 418 F. App'x 374, 380–81 (6th Cir. 2011). But the trial court has no "duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Rather, "the court may rely on the moving party's unrebutted recitation

of the evidence, or pertinent portions thereof, in reaching a conclusion that certain evidence and inferences from evidence demonstrate facts which are 'uncontroverted.'" *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 410 (6th Cir. 1992). "If such evidence supports a conclusion that there is no genuine issue of material fact," the court should grant summary judgment for the movant. *Id.*

## II.    FACTS AND BACKGROUND

Stiles, then represented by counsel, filed this case in September 2024. (Doc. No. 1, Compl.) As set forth in the Complaint, Stiles is a "person of color and a queer female" and was employed by Ingram as a welder from February 28, 2022 until July 2023. (*Id.* ¶¶ 1, 7, 9.) She alleges that Ingram created a racially and sexually hostile work environment and that it retaliated against her and then constructively discharged her when she complained about discrimination and harassment to supervisors and Human Resources ("HR"). Based on these allegations, Stiles asserts claims against Ingram under Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981 for discrimination on the basis of race and sex, hostile work environment, retaliation, and constructive discharge. (Doc. No. 1, Counts I–V.)

Based on Ingram's SUMF, it is undisputed for purposes of Ingram's Motion for Summary Judgment that Stiles was hired by Ingram in February 2022 as a Welder Trainee and promoted to Welder I and then to Welder II. (SUMF ¶ 1.) While employed by Ingram, she reported to Charles Toon, Repair Supervisor, and Toon reported to Tyler Simons, Facility Manager. (*Id.* ¶ 2.) During her employment, Stiles worked primarily at Ingram's Metropolis, Illinois location ("Metropolis location") but also across the Ohio River at Ingram's Engineering Landing location in Paducah, Kentucky ("Paducah location"). (*Id.* ¶ 3; *see also* Doc. No. 48-1 at 20–21, Stiles Dep. 188–89.)

On January 25, 2023, Stiles emailed Melissa Ryan, then Team Lead for HR, alleging that five days earlier, a fellow welder, Jarren Hines, tampered with her welding equipment while she was taking a welding exam at a local technical college. (SUMF ¶ 4.) Stiles told Ryan that, after

seeing Hines "manipulating" her equipment, she had to reset the "arc control setting" on her welder at least four times during testing. (Doc. No. 48-2 at 22.) Stiles thereafter failed the certification test, but she does not know which part of the certification test she failed or if her failure was related to the arc control setting issue. (SUMF ¶ 6.)

Stiles did not tell Ryan that she believed Hines manipulated her equipment because of her race, gender, or sexual orientation. (Doc. No. 48-1 at 41, Stiles Dep. 228.) Ryan, along with Tyler Simons, investigated the incident by interviewing Stiles, Hines, and the instructor overseeing the certification test. (Doc. 48-3, Ryan Decl. ¶¶ 7–9.) Hines denied tampering with or adjusting Stiles' equipment. (*Id.* ¶ 8.) The instructor did not see anyone touch Stiles' equipment. (*Id.*) During her interview, Stiles indicated that her issue with Hines was that she believed he had started a rumor in 2022 about welders being paid different amounts. She also believed that she had lost a promotional opportunity because she failed the certification test. (*Id.* ¶ 9.) However, the certification test was not required for promotion to Welder II. (*Id.*) In any event, because it was a "he-said, she-said" situation, and because there was no evidence that Stiles failed the test because of tampering, Ryan and Simons concluded the investigation without disciplining Hines. (*Id.* ¶ 10.)

Stiles spoke with Rhonda Ware, Ingram's now former HR Business Partner, about the incident on June 29 and 30, 2023. At that time, Stiles stated, "I didn't make this about my diversity. I was very clear that this was about my certification test being tampered with . . . . I didn't bring [diversity] up." (SUMF ¶ 7 (quoting Pl. Dep. Ex. 41, manually filed audio file at 17:08).) In other words, she never told Ryan that she believed Hines' action was based on her race, sex, or sexual orientation. (*Id.*)

At a facility meeting on January 30, 2023 (the "Facility Meeting"), Ryan, Simons, and Toon had included an agenda item about The Ingram Way and reiterated the company's

expectations that co-workers respect others and promote a positive working environment. Both Stiles and Hines attended this meeting. (SUMF ¶ 14.)

In late February 2023, Simons assigned Stiles and two white, male co-workers, Ethan Prather and Collin Hauser, to a project at the Paducah location. (*Id.* ¶¶ 15, 19.) Stiles received the same pay and benefits regardless of whether she worked at the Metropolis location or the Paducah location, and the Paducah location was closer to her home. (*Id.* ¶¶ 16–17.) Ingram often assigned welders to work out of different locations, like Metropolis and Paducah, from time to time. (*Id.* ¶ 18.)

On March 3, 2023, Simons promoted Stiles, Prather, and Hauser to Welder II. (*Id.* ¶ 20.) As a result of her promotion, Stiles received a pay raise from $18.47 per hour to $22.25 per hour. (*Id.* ¶ 21.)

On June 27, 2023, Stiles submitted a two-week notice of her resignation effective July 3, 2023. (*Id.* ¶ 22.) On the same day, June 27, 2023, Stiles received a merit increase in her Welder II position and a pay raise from $22.25 to $24.35 per hour. (*Id.* ¶ 23.)

On June 28, Stiles emailed Rhonda Ware to inform her that she had "sent in [her] two week notice" earlier that week "due to ongoing issues at work." (Doc. No. 48-2 at 27.) She explained that, although she "enjoy[ed] the work" at Ingram, the "workplace ha[d] become hostile for [her]" and the "hostility ha[d] worsened" since she had submitted her notice. (*Id.*) In particular, she "left at lunch [that day] due to feeling uncomfortable after being photographed and asked to do an interview." (*Id.*)

Ware responded almost immediately, expressing disappointment at having learned about Stiles' resignation and concern "about any issues" Stiles had experienced, and asking if they could talk "as soon as possible." (*Id.*) Stiles responded late that same night, notifying Ware that she felt

uncomfortable reporting to work and "outlining the ongoing issues" she had experienced at Ingram." (Doc. No. 48-2 at 25.) This list included complaints about (1) Hines and others tampering with her welding equipment on January 19, 2023, March 29, 2023, and June 27, 2023; (2) her supervisor's and HR's failure to take her seriously when she complained about "wage rumors" in August 2022 and about Hines' tampering with her equipment in January 2023; (3) inappropriate comments and horseplay on the job (that were not specifically related to race or sex) on April 21, 2023; (4) "ostracism due to gender," including "recurring" comments that she construed as disrespectful and as insinuating that she received special treatment from Toon, and, on two occasions during the week of June 5, 2023, comments that she construed as insinuating that she was fat; and (5) being asked to participate in a video shoot about safety on June 28, 2023, when the individual doing the filming knew personal details about her—that she had dogs—that made her uncomfortable. (*Id.* at 26–27.)

After receiving this email, Ware granted Stiles a paid leave of absence from work while she investigated Stiles' June 28 complaints. Stiles remained on paid leave for the duration of this investigation. (SUMF ¶¶ 27–28.)

The investigation began on June 30, 2023, with an investigation team comprised of Ware, Simons, Ryan, and two other Ingram supervisors, Lee Jennings and Kelly Clapp. (*Id.* ¶ 29.) Ware remained in contact with Stiles during the investigation, speaking with her on the phone on June 29, June 30, July 10, July 11, July 14, July 19, and July 29, for a total of at least 4 hours and 54 minutes. (*Id.* ¶ 30.) Stiles secretly recorded these calls. (*Id.* ¶ 31.)

As part of the investigation into Stiles' complaints, Ingram interviewed individuals allegedly involved in the harassment, including Prather, Toon, and another Ingram employee named Matt Hall, as well as Stiles. (*Id.* ¶ 32.) Ingram concluded its investigation on July 19, 2023.

Based on the interviews, it made the following findings corresponding to each of the plaintiff's complaints:

- There were no witnesses to confirm that anyone had tampered with Ms. Stiles's equipment. Ms. Stiles herself had not witnessed any tampering and had based her allegations on assumptions. There were other reasonable explanations (such as user error) or inadvertent adjustments to explain the issues.

- Ingram's discussion of the Ingram Way at the Facility Meeting was consistent with its practices and did not mention Ms. Stiles.

- Mr. Toon admitted to motivating Mr. Hines by making comments like "Are you going to let a girl beat you." Mr. Toon also admitted that he asked Ms. Stiles if she was upset because her girlfriend broke up with her. Ingram determined these type of comments were not respectful and violated Ingram's policies. Ingram issued Mr. Toon with a verbal counselling as a result and instructed him to stop such behavior.

- Mr. Prather confirmed that Mr. Houser had briefly held the door closed blocking Ms. Stiles from exiting the bathroom and that he did not intervene. Ingram determined this was inappropriate horseplay. Mr. Prather also confirmed that he threw soapstone toward Ms. Stiles (even if unintentional) after they engaged in an argument. Ingram determined this was inappropriate horseplay. Mr. Prather was placed on an Associate Improvement Plan as a result and was coached on The Ingram Way.

- Ingram determined that Mr. Toon had properly escalated the incident involving Joe Carter and that Mr. Jennings had already completed an investigation and appropriately verbally counselled the two employees (Joe and Brandon) involved on adherence to the Ingram Way.

- Ingram determined that Mr. Cross asking Ms. Stiles to participate in an internal safety-related video was consistent with his job function and that Ms. Stiles had already confirmed that someone could have simply told him she had dogs which she believed was fine.

(Ryan Decl. ¶ 22.) In sum, as a result of the investigation, Toon received counseling and additional training. Prather, Hall, and Carter were placed on Associate Improvement Plans, though Carter was terminated for attendance before his plan could be issued. In addition, Ingram hired a consultant to do Respectful Workplace Training for employees. (*Id.* ¶ 23.)

Ware called Stiles on July 19, 2023 and informed her the investigation was complete. (SUMF ¶ 81.) Ware explained to Stiles that, while the investigation revealed "some evidence of

behavior contrary to Ingram culture," which the company would address, the investigators "did not find evidence of a hostile environment." (Doc. No. 48-2 at 28.) She explained that she could not share the specific actions taken but that Ingram would be taking appropriate action and addressing behaviors that did not align with Ingram's values. (SUMF ¶ 82.) She also asked Stiles if Stiles wanted to rescind her resignation. (*Id.* ¶ 83.) Stiles responded that she needed some more time to think about whether she wanted to return to work at Ingram. (*Id.* ¶ 84.) On Friday, July 21, 2023, Stiles informed Ware that she would not be returning to Ingram and would be proceeding with her resignation. (*Id.* ¶ 85.)

Stiles had applied to Local Union #782 Ironworker Apprentice Program (the "Apprenticeship") in early February 2023. (*Id.* ¶ 88.) Her application was known to her supervisors and colleagues (but not HR), and she openly took time off work to apply and to attend related meetings and interviews through the spring of 2023. (*Id.* ¶ 89.) She was formally accepted to the Apprenticeship on April 6, 2023 and attended orientation on May 15 and 16, 2023. (*Id.* ¶ 90.) Her first day of employment through the Apprenticeship was July 26, 2023. (*Id.* ¶ 91.)

## III. DISCUSSION

### A. Sex and Race Hostile Work Environment Claims

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The plaintiff claims that she suffered a hostile work environment based on her sex, sexual orientation, and race. To establish a *prima facie* hostile-work environment claim, a plaintiff must show: "(1) she was a member of a protected class; (2) she was subjected to unwelcomed harassment; (3) the harassment was based on [a protected characteristic]; (4) the harassment created a hostile work environment; and (5) employer liability." *Wyatt v. Nissan N.*

*Am., Inc.*, 999 F.3d 400, 411 (6th Cir. 2021) (quoting *Ladd v. Grand Trunk W. R.R.*, 552 F.3d 495, 500 (6th Cir. 2009)).

Ingram asserts that it is entitled to summary judgment on the plaintiff's hostile work environment claims because (1) Stiles cannot show that the alleged harassment was based on race, sex, or sexual orientation; (2) the alleged harassment was not sufficiently severe or pervasive to create a hostile work environment; and (3) Stiles cannot show that Ingram knew or should have known about the alleged harassment and failed to take corrective action.

The court finds that, while there is some indication in the record that a few of the allegedly harassing incidents were based on Stiles' gender, she never suggests that any of them was related to her race. Regardless, Ingram has carried its burden of showing that the alleged harassment was not sufficiently severe or pervasive to alter the terms and conditions of Stiles' employment. As the Sixth Circuit and Supreme Court have explained, "[h]arassment creates a hostile work environment '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Wyatt*, 999 F.3d at 411 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21) (1993)) (some internal quotation marks omitted). "The conduct must be severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive." *Id.* (internal quotation marks and citation omitted). To assess whether harassing conduct has become "objectively severe or pervasive," courts must consider such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris*, 510 U.S. at 23). It is well established that a handful of isolated incidents, unless extremely serious,

fail to establish a hostile work environment. *See, e.g.*, *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000).

In this case, the plaintiff's claims that her equipment was tampered with were unsubstantiated and based on Stiles' subjective belief that someone might have tampered with her equipment. She does not associate these incidents with her race or sex. A few other sporadic incidents involved horseplay and inappropriate comments, arguably with sexist overtones, but these incidents have not been shown to be either severe or pervasive—and certainly not sufficiently severe or pervasive to have created an objectively hostile work environment.

Finally, the evidence does not indicate that Ingram's HR department or the plaintiff's supervisors failed to respond appropriately to the plaintiff's complaints. Each time the plaintiff complained, Ingram conducted an investigation, and the plaintiff never reiterated her complaints after the investigations concluded or objected to them as insufficient. When her supervisor learned about inappropriate comments made by a co-worker, he escalated the matter to his supervisor, who investigated and issued corrective action.

Ingram has carried its burden of showing that there are no material factual disputes and that Stiles cannot establish a *prima facie* case of hostile work environment. Ingram is entitled to summary judgment as a matter of law on the plaintiff's hostile work environment claims.

**B.    Sex and Race Discrimination under Title VII and § 1981[1]**

Ingram, in an abundance of caution, moves separately for summary judgment on the race and sex discrimination claims under Title VII and § 1981, even though it is not clear from the

---

[1] Race discrimination claims brought under § 1981 and Title VII are reviewed under the same standard. *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 771 (6th Cir. 2018). Title VII prohibits discrimination based on sex, race, and other characteristics, while § 1981 prohibits discrimination based on race.

Complaint whether the plaintiff intended to bring discrimination claims, apart from her hostile work environment claims.

When a plaintiff seeks to prove discrimination claims based on indirect evidence, as is presumably the case here, the court typically applies the familiar three-part burden-shifting framework derived from *McDonnell Douglas Corp. v. Green*, 411 U.S. 79 (1973), as modified by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), to determine whether the plaintiff has proffered sufficient evidence to survive summary judgment. *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606 (6th Cir. 2019). Under this framework, the plaintiff must first make out a *prima facie* case of discrimination. *Levine v. DeJoy*, 64 F.4th 789, 797 (6th Cir. 2023) (citing *Burdine*, 450 U.S. at 253). If, and only if, the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* (quoting *Burdine*, 450 U.S. at 253) (some internal quotation marks omitted). If the defendant does so, the plaintiff then has the opportunity to prove that the reasons offered by the defendant were "not its true reasons, but were a pretext for discrimination." *Id.* (quoting *Burdine*, 450 U.S. at 253).

To make out a *prima facie* case of discrimination, the plaintiff must show that "(1) [s]he is a member of a protected class; (2) [s]he was qualified for [her] job; (3) [s]he suffered an adverse employment decision; and (4) [s]he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *Id.* (citations omitted) (alterations in original). To obtain summary judgment on Title VII or §1981 claims at the *prima facie* stage, the defendant must show that there is no genuine issue of material fact as to at least one of the elements of the plaintiff's *prima facie* case and that it is entitled to judgment as a matter of law on that element. Here, Ingram argues that the plaintiff cannot show that she suffered an adverse

employment action or that she was replaced by, or treated less favorably than, a similarly situated employee outside her protected class.

As for the first argument, an adverse employment action is "a materially adverse change in the terms and conditions of [a plaintiff's] employment." *Redlin*, 921 F.3d at 607 (quoting *Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010)). The action must "constitute[] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008)). A "bruised ego," "mere inconvenience," and "an alteration of job responsibilities" are not adverse employment actions. *Spees*, 617 F.3d at 391 (citation omitted).

Insofar as the plaintiff contends that her temporary assignment to the Paducah location was an adverse employment action, the record does not support such an inference. As set forth above, the plaintiff and two other individuals were assigned to the Paducah location. The plaintiff's pay and benefits did not change, except that she was promoted to Welder II and received a pay raise, and the location was closer to her home, making for a shorter commute. She has not proffered any evidence that the conditions of employment at Paducah were less favorable than those at the Metropolis location, and she testified that Ingram regularly moved welders around to different locations. (Doc. No. 48-1 at 70–71, Stiles Dep. 292–93.) Nothing in the record suggests that Stiles was treated differently from other employees or that the temporary assignment to Paducah qualifies as an adverse employment action.

The only other adverse employment action to which Stiles points is her "constructive discharge." "A constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced

into an involuntary resignation." *Laster v. City of Kalamazoo*, 746 F.3d 714, 727–28 (6th Cir. 2014) (internal quotation marks and citations omitted); *see also Garcia v. Beaumont Health Royal Oak Hosp.*, No. 22-1186, 2022 WL 5434558, at *7 (6th Cir. Oct. 7, 2022) (citing *Laster*). To demonstrate a constructive discharge, the plaintiff must adduce evidence to show that "1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit." *Laster*, 746 F.3d at 728.

Constructive discharge may take two forms. First, "[w]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive discharge." *Id.* (citation omitted). The plaintiff here does not contend that she would have been fired if she had not resigned.

Alternatively, when a plaintiff alleges that she resigned because of discriminatory harassment, courts "require the plaintiff to demonstrate a discriminatory work environment even more egregious than the high standard for hostile work environment." *Id.* (citation omitted). This form is presumably the type that Stiles seeks to prove. In this situation, a constructive discharge requires a showing that "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Smith v. Henderson*, 376 F.3d 529, 533–34 (6th Cir. 2004) (citation omitted). But, when the plaintiff "has failed to present sufficient evidence to support even a *prima facie* case of hostile work environment, [her] claim of constructive discharge premised on a hostile work environment fails." *Brown v. Metro. Gov't*, 722 F. App'x 520, 526 (6th Cir. 2018) (citing *Penn. State Police v. Suders*, 542 U.S. 129, 149 (2004) ("Creation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case."). Because, as set forth above, the plaintiff

cannot establish a *prima facie* hostile work environment claim, her constructive discharge claim necessarily fails.

Because the plaintiff has not shown that she suffered an adverse employment action or that she was treated differently from similarly situated employees, Ingram is entitled to summary judgment on the plaintiff's race and sex discrimination claims.

### C. Retaliation Claims[2]

Finally, Stiles claims that she suffered retaliation after complaining about discrimination. The plaintiff's retaliation claims are premised upon Ingram's purportedly "subjecting [her] to increasingly pervasive discrimination/harassment in the workplace" and "fail[ing] to properly remedy" or to "prevent the escalating discrimination/harassment in the workplace," which ultimately resulted in her constructive discharge. (Compl. ¶¶ 70–72, 82.)

To avoid summary judgment on these claims, the plaintiff must present proof that "(1) [s]he engaged in activity protected by Title VII; (2) [her] exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Bilyeu v. UT-Battelle, LLC*, 154 F.4th 396, 405 (6th Cir. 2025) (quoting *Laster*, 746 F.3d at 730). The standard for proving an adverse employment action in the retaliation context is less demanding than the standard applied to discrimination claims. In this context, the plaintiff needs only to point to some action that a "reasonable employee" would have found to be "materially adverse," meaning that it "well might have dissuaded a reasonable worker from

---

[2] "The elements of a retaliation claim under § 1981 are the same as those under Title VII," *Boxill v. O'Grady*, 935 F.3d 510, 520 (6th Cir. 2019), and, in the Sixth Circuit, courts "review § 1981 claims under the same standard as Title VII claims," *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 512 (6th Cir. 2009).

making or supporting a charge of discrimination." *Laster*, 746 F.3d at 719 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 2006)).

Here, the plaintiff's complaint about Hines' tampering with her equipment did not qualify as protected activity, because she expressly disavows connecting his actions with her race or gender. Assuming that her complaints to Toon about co-workers referring to her as fat qualify as protected activity, the evidence presented by Ingram shows that Toon reported this complaint up the chain of command, that an investigation was conducted, and that the other employee was subject to disciplinary action. The plaintiff does not show that *Ingram* took any adverse employment action against her of any kind after that, nor does she even point to any other instances of "harassment" that took place after this incident—much less any action that was causally related to her complaint.

The next time Stiles engaged in protected conduct was through her June 28, 2023 email to Rhonda Ware. As set forth above, however, the plaintiff never returned to work after reporting to Ware that she had been subjected to a hostile work environment—she was placed on a paid leave of absence, and she had already submitted her notice of resignation. After the investigation concluded, Ware invited Stiles to rescind her resignation, but Stiles chose not to do so. Under these circumstances, Stiles cannot show that her protected activity either led to retaliatory harassment or was causally connected to her decision to resign.

Ingram, in short, has carried its burden of showing that there are no material factual disputes and that it is entitled to summary judgment on the plaintiff's retaliation claims.

## IV.    CONCLUSION

For the reasons set forth herein, Ingram's Motion for Summary Judgment (Doc. No. 45) will be granted. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge